# EXHIBIT 1

# EXHIBIT 1

*** Electronically Filed ***
G. Roa, Deputy
11/9/2020 4:24:29 PM
Filing ID 12201317

Michael C. McKay, Esq. (023354)
**MCKAY LAW, LLC**
5635 N. Scottsdale Road, Suite 170
Scottsdale, Arizona 85250
Telephone: 480.681.7000
Email: mmckay@mckaylaw.us
Attorney for Plaintiff

## ARIZONA SUPERIOR COURT
## COUNTY OF MARICOPA

| | |
|---|---|
| EDUINO N. PINHEIRO, | Case No. **CV2020-055746** |
| Plaintiff, | **COMPLAINT** |
| vs. | **DEMAND FOR JURY TRIAL** |
| MONSANTO COMPANY, | Discovery Tier 3 |
| Defendants. | |

### NATURE OF ACTION

1.      This is an action to obtain redress for damages and injuries incurred by Eduino N. Pinheiro (Pinheiro) caused by Monsanto Company (Monsanto). Pinheiro used a substantial amount of Roundup weed killer (Roundup). After using Roundup, Pinheiro was diagnosed with Non-Hodgkin Lymphoma.

2.      Courts throughout the United States have begun to recognize the use of Roundup causes Non-Hodgkin Lymphoma. There have been lawsuits filed across the United States by individuals who used and/or were exposed to Roundup and later were diagnosed with cancer. By some accounts nearly 11,000 individuals have filed lawsuits. The first bellwether trial involving an individual diagnosed with non-Hodgkin's lymphoma resulted in a $289 million jury verdict against Defendants in August 2018. To date there has been three jury verdicts totally more than $2 billion in damages. Pinheiro brings similar claims here.

McKay Law
LLC
LAW OFFICES
5635 N. Scottsdale Road, Suite 170
Scottsdale, Arizona 85250
480.681.7000

McKay Law
LLC
LAW OFFICES
5615 N. Scottsdale Road, Suite 170
Scottsdale, Arizona 85250
480.681.7000

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over this action pursuant to the Constitution of the State of Arizona, and A.R.S. §§ 12-123 and 44-2031.

4.     The amount in controversy is in excess of $50,000, exclusive of attorney fees and Court costs.

5.     Venue is proper in this Court pursuant to A.R.S. §§ 12-401 and 44-2031.

6.     The events complained herein occurred in Maricopa County, Arizona. Monsanto is authorized to do business in Arizona. Indeed, Monsanto is registered with the Arizona Corporation Commission as Arizona foreign business corporations. The Corporation Service Company is Monsanto's statutory agent. Monsanto has sufficient minimum contacts in Arizona, or otherwise intentionally avails itself of the Arizona market so as to render the exercise of jurisdiction over them by Arizona courts consistent with traditional notions of fair play and substantial justice.

7.     This case should proceed under Discovery Tier 3.

## PARTIES

8.     Plaintiff is an individual who resides in Maricopa County, State of Arizona.

9.     Defendant Monsanto Company is an American agrochemical and agricultural biotechnology company. Monsanto is a Delaware corporation with its principal place of business in St. Louis Missouri. At all times relevant to this complaint, Monsanto was the entities that discovered, manufacture, and sold Roundup. Monsanto has regularly transacted and conducted business in Arizona, and has derived substantial revenue from goods and products, including Roundup, used in the State of Arizona. Monsanto expected or should have expected its acts to have consequences within the State of Arizona.

## FACTUAL BACKGROUND

10.     In 1970, Monsanto discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup, Roundup is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By

- 2 -

McKay Law
LAW LLC
OFFICES
5615 N. Scottsdale Road, Suite 170
Scottsdale, Arizona 85250
480.681.7000

2001, glyphosate had become the most-used active ingredient in American Agriculture with 85-90 million of pounds used annually. The number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

11.     Monsanto is a multinational agricultural biotechnology company based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world's seed market. The majority of these seeds are Roundup ready brand. The stated advantage of Roundup ready crops is that the substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in fields during the growing season without harming crops. In 2010, and estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup ready.

12.     Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate

13.     On March 20, 2015, the International Agency for Research Cancer (IARC), an agency of the World Health Organization (WHO), issued an evaluation of several herbicides, including glyphosate. The evaluation was based in part, on studies of exposants to glyphosates since 2001.

14.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC working group provides a thorough review of numerous studies and data relating to glyphosates exposure to humans.

15.     The IARC classified glyphosate as a Group 2A , which means that it is probably carcinogenetic to humans. The IARC concluded that the cancers most associated with glyphosate exposure are Non-Hodgkin Lymphoma and other haematopoietic cancers. The

IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

16.     Nevertheless, Monsanto, since it began selling Roundup, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world that Roundup creates no unreasonable risks to human health or to the environment.

17.     Plants treated with Roundup generally die within two to three days. Because plants absorb glyphosates, it cannot be completely removed by washing or peeling produce or by milling, baking or brewing grains.

18.     For nearly 40 years, farms across the world have used Roundup without knowing of the dangers its uses poses. That is because when Monsanto first introduced Roundup, it touted glyphosates as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup – glyphosate – is a probable cause of cancer.

19.     Monsanto assured the public that Roundup was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup was safe.

20.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup. From the outset, Monsanto marketed Roundup as a "safe" general purpose herbicide for widespread commercial and consumer use. It still markets Roundup as safe today.

21.     The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA or Act), 7 U.S.C. § 136 *et seq*. FIFRA requires that all pesticides be registered with

McKay Law
LLC
LAW OFFICES
5615 N. Scottsdale Road, Suite 170
Scottsdale, Arizona 85250
480.681.7000

the Environmental Protection Agency (EPA) prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a.

22.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate to the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance of finding of safety. The determination the EPA must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

23.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of the pesticides." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a regulation should be granted or allowed to continue to be sold in commerce.

24.     FIFRA generally requires Monsanto, in the case of Roundup, to conduct health and safety testing of Roundup. The EPA has protocols governing the conduct and scope of tests required by Monsanto and the laboratory practices that must be followed in conducting these tests. The data produced by Monsanto must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the products tests that are required of Monsanto.

25.     The evaluation of each pesticide product, like Roundup, is completed at the time the product is initially registered under FIFRA. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registrations." 7 U.S.C. § 136a1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

26. On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of Roundup products for registration purposes committed fraud.

27. In the first instance, Monsanto, in seeking initial registration of Roundup by the EPA, hired Industrial Bio-Test Laboratories (IBT) to perform and evaluate toxicology studies relating to Roundup. In 1976, the United States Food and Drug Administration (FDA) performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to Roundup. The EPA subsequently audited IBT and specifically found IBT's testing of Roundup to be invalid. The EPA found "routine falsification of data" at IBT and concluded it was "hard to believe the scientific integrity of the [IBT] studies."

28. Three top executives of IBT were convicted of fraud in 1983.

29. In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide safety studies, including for Roundup. In that same year, the owner of Craven Laboratories and three of its employees were indicted and later convicted of fraudulent laboratory practices in the testing of pesticides and herbicides.

30. Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup in 115 countries. In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.

31. In 1996, the New York Attorney General (NYAG) filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that Roundup was "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

A. Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences...

B. And remember that Round is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

C. Roundup biodegrades into naturally occurring elements.

D. Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

E. This non-residual herbicide will not wash or leach in the soil. It ...stays where you apply it.

F. Roundup is less toxic to rats than table salt following acute oral ingestion.

G. Roundup's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

H. You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds, and fish.

I. Roundup can be used where kids and pets will play and breaks down into natural material.

32.     In November 1996, Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, to cease and desist from publishing or broadcasting and advertisements in New York that represent, directly or by implication, that Roundup is safe, non-toxic, harmless, or free from risk. Monsanto also agreed to refrain from representing that Roundup is biodegradable, that it will not move

through the environment, or that it is good for the environment, or is known for its positive environmental characteristics.

33.     Monsanto did not alter its advertising of Roundup, however, in any state other than New York.

34.     In 2009, Frances highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised Roundup as biodegradable and that it left soil clean.

35.     Several countries have instituted wholesale bans on the sale of Roundup because of Monsanto's misrepresentations and the unique and severe dangers Roundup presents to humans and the environment.

36.     There have been lawsuits filed across the United States by consumers who used and/or were exposed to Roundup and diagnosed with cancer, by some accounts nearly 11,000 individuals have filed suits. The first bellwether trial involving an individual diagnosed with Non Hodgkin's Lymphoma resulted in a $289 million jury verdict against Monsanto in August 2018. To date there has been three jury verdicts totally more than $2 billion in damages.

37.     Pinheiro used Roundup extensively for many years. He read Monsanto's advertisements and believed Roundup was safe for him to use.

38.     Pinheiro was diagnosed with Non-Hodgkin Lymphoma in July of 2020. He is currently suffering through cancer treatments, medications, anticipates surgeries, and immense physical and psychological pain – and perhaps worse.

39.     Pinheiro did not know and could not reasonably have known that Monsanto was producing, marketing, and selling cancer causing Roundup to unsuspecting consumers, including to herself.  Pinheiro's claims did not accrue until shortly before the filing of this action.

40.     Monsanto's conduct was inherently-self concealing. Monsanto knew that Pinheiro could not determine that Roundup was toxic to humans and linked to cancer. Monsanto actively and fraudulently concealed that Roundup is toxic.

41.     The statute of limitations applicable to any claims that Pinheiro has brought or could bring as a result of the unlawful and fraudulent concealment and course of conduct described herein has been tolled as a result of Monsanto's fraudulent concealment.   In addition, Pinheiro did not and could not have discovered the causes of action until shortly before filing this Complaint, thereby tolling any applicable statute of limitations.

## COUNT ONE
### (Strict Liability – Defective Design)

42.     Pinheiro repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

43.     Pinheiro brings this strict liability claim against Monsanto for defective design.

44.     At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonable dangerous to consumers, including Pinheiro, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed Roundup products that Pinheiro was exposed to, as described above.

45.     At all times relevant to this litigation, Monsanto's Roundup products reached the intended consumers, handlers, and users coming into contact with these products in Arizona, California, and throughout the United States, including Pinheiro, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

46.     Monsanto's products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were

defective in design and formulation in that when they left the hands of Monsanto's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

47.   Monsanto's products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of Monsanto's manufacturers and/or suppliers, because the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

48.   At all times relevant to this action, Monsanto knew or had reason to know that its Roundup products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

49.   Monsanto's products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

A. When placed in the stream of commerce, Monsanto's Roundup products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

B. When placed in the stream of commerce, Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illness when used in a reasonably anticipated manner.

C. When placed in the stream of commerce, Roundup contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

D. Monsanto did not sufficiently test, investigate, or study its Roundup products and even hid known dangers of the products.

E. Monsanto should have known Roundup causes cancer.

McKay Law
LLC
LAW OFFICES
5615 N. Scottsdale Road, Suite 170
Scottsdale, Arizona 85250
480.681.7000

F. Monsanto did not conduct adequate post-marketing surveillance of its Roundup products.

G. Monsanto could have employed safer alternative designs and formulations.

50.     Pinheiro was exposed to Roundup products while living in California without knowledge of its dangerous characteristics. To be sure, Pinheiro was the owner of diaries in San Juaquin and Glenn Counties, in California. He worked in his dairies and lived on his dairies for many years – more than 20 years. He purchased Roundup in bulk, often from Kellogg's Seed Service in Paradise California. He used and was exposed to large quantities of Roundup products through his many years working and living on his dairies.

51.     Pinheiro could not have reasonably discovered the defects and risks associated with Roundup before the time of exposure.

52.     The harm caused by Monsanto's Roundup far outweighs any benefit. Indeed, Roundup caused Pinheiro to become diagnosed with cancer and to suffer unimaginable physical and mental pain and anguish.

53.     As a direct and proximate result of Monsanto placing defective and dangerous Roundup products into the stream of commerce, Pinheiro has suffered and continues to suffer grave injuries and has suffered physical pain and discomfort, as well as economic hardship, including considerable financial expense for medical care and treatment. Pinheiro will continue to incur these expenses in the future.

54.     Therefore, as a result of the unreasonably dangerous condition of roundup products, Monsanto is strictly liable to Pinheiro.

## COUNT TWO
### (Strict Liability – Failure to Warn)

55.     Pinheiro repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

56.     Pinheiro brings this strict liability claim against Monsanto for failure to warn.

57.     At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and

- 11 -

promoting Roundup products, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup. These actions were under the ultimate control and supervision of Monsanto.

58.     At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products to consumers, including Pinheiro, and therefore had a duty to warn of the risks associated with the use of Roundup products.

59.     At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn Pinheiro of the dangers associated with Roundup use and exposure. Monsanto is held to the knowledge of an expert in the field.

60.     Monsanto could have provided the warnings of instructions regarding the full and complete risks of roundup because it knew of should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

61.     At all times relevant, Monsanto failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure to roundup. The dangerous propensities of Roundup and the carcinogenic characteristics of Roundup were known to Monsanto or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time it distributed, supplied, or sold Roundup and not known to end users like Pinheiro.

62.     Monsanto knew or should have known that Roundup created significant risks of serious bodily harm to consumers and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to Roundup. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup and actively made misleading statements concerning the safety of Roundup.

63.     As a result of its inadequate warnings, Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, and when Pinheiro became exposed.

64.     Monsanto is liable to Pinheiro for injuries caused by negligent or willful failures, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to Roundup.

65.     The defects in Roundup products were substantial and contributing factors in causing Pinheiro's cancer and related injuries, and but for Monsanto's misconduct and omissions, Pinheiro would not have sustained his injuries.

66.     Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup, Pinheiro could have and would have avoided the risk of developing cancer as alleged herein.

67.     As a direct and proximate result of Monsanto placing defective and dangerous Roundup products into the stream of commerce, and failing to warn about the risks and dangers of the product, Pinheiro has suffered and continues to suffer grave injuries and has suffered physical pain and discomfort, as well as economic hardship, including considerable financial expense for medical care and treatment. Pinheiro will continue to incur these expenses in the future.

68.     Therefore, as a result of the failure to warn about the dangers of the Roundup products, Monsanto is strictly liable to Pinheiro.

## COUNT THREE
### (Negligence)

69.     Pinheiro repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

70.     Monsanto caused Roundup to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Pinheiro.

71.     Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, sale, and distribution of Roundup, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

72.     Monsanto owed Pinheiro a duty of care to provide accurate, true, and correct information concerning the risks of using Roundup.

73.     Monsanto knew or in the exercise of reasonable care should have known of the hazards and dangers of Roundup, including the carcinogenic properties of Roundup and the likelihood that users of the product would contract cancer from Roundup.

74.     Monsanto also knew or should have known that Pinheiro was unaware of the risks and the magnitude of the risks associated with the use of Roundup.

75.     As such, Monsanto breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisements, packaging, sale, and distribution of roundup in that Monsanto knew or had reason to know of the defects inherent in Roundup, and knew or had reason to know that Pinheiro's exposure to Roundup created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent, or adequately warn of these risks and injuries.

76.     Monsanto's breaches of duty and negligence directly and proximately caused Pinheiro's injuries.

**WHEREFORE**, Pinheiro prays for judgment against Monsanto for:

      A.     Compensatory damages in an amount to be determined at trial;

      B.     Punitive damages;

      C.     All appropriate special damages;

      D.     All costs and expenses incurred herein;

      E.     And for such further relief as may be appropriate.

McKay Law
LLC
LAW OFFICES
5615 N. Scottsdale Road, Suite 170
Scottsdale, Arizona 85250
480.681.7000

DATED: November 9, 2020

**MCKAY LAW, LLC**

/s/ Michael C. McKay
5635 N. Scottsdale Road, Suite 170
Scottsdale, Arizona 85258
Telephone: 480.681.7000
Facsimile: 480.348.3999
Email: mmckay@mckaylaw.us
*Attorney for Plaintiff*

- 15 -

Clerk of the Superior Court
*** Electronically Filed ***
G. Roa, Deputy
11/9/2020 4:24:29 PM
Filing ID 12201318

# In the Superior Court of the State of Arizona
# In and For the County of Maricopa

**Plaintiff's Attorney:**
Michael C McKay
Bar Number: 023354, issuing State: AZ
Law Firm: McKay Law, LLC
5635 N. Scottsdale Road Suite 170
Scottsdale, AZ 85250
Telephone Number: (480)681-7000
Email address: mmckay@mckaylaw.us

**CV2020-055746**

**Plaintiff:**
Eduino Pinheiro
Telephone Number: (480)287-2555
Email address: mmckay@mckaylaw.us

**Defendant:**
Monsanto Company
809 Levee Drive
Manhattan, KS 66502

Discovery Tier t3

Case Category: Tort Non-Motor Vehicle
Case Subcategory: Product Liability - Toxic/Other

AZturboCourt.gov Form Set #5134450



**null / ALL**
**Transmittal Number: 22321979**
**Date Processed: 11/19/2020**

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Anne Troupis (Monsanto)<br>Bayer U.S. LLC<br>800 N Lindbergh Blvd<br>Saint Louis, MO 63167-1000 |

| | |
|---|---|
| **Entity:** | Monsanto Company<br>Entity ID Number  2282193 |
| **Entity Served:** | Monsanto Company |
| **Title of Action:** | Pinheiro, Eduino N. vs. Monsanto Company |
| **Matter Name/ID:** | Pinheiro, Eduino N. vs. Monsanto Company (10674277) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Product Liability |
| **Court/Agency:** | Maricopa County Superior Court, AZ |
| **Case/Reference No:** | CV2020-055746 |
| **Jurisdiction Served:** | Arizona |
| **Date Served on CSC:** | 11/18/2020 |
| **Answer or Appearance Due:** | 20 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Michael C. McKay<br>480-681-7000 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

Clerk of the Superior Court
*** Electronically Filed ***
G. Roa, Deputy
11/9/2020 4:24:29 PM
Filing ID 12201320

Person/Attorney Filing: Michael C McKay
Mailing Address: 5635 N. Scottsdale Road Suite 170
City, State, Zip Code: Scottsdale, AZ 85250
Phone Number: (480)681-7000
E-Mail Address: mmckay@mckaylaw.us
[ ] Representing Self, Without an Attorney
(If Attorney) State Bar Number: 023354, Issuing State: AZ

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## IN AND FOR THE COUNTY OF MARICOPA

Eduino Pinheiro
Plaintiff(s),
v.
Monsanto Company
Defendant(s).

Case No. **CV2020-055746**

**SUMMONS**

To: Monsanto Company

**WARNING: THIS AN OFFICIAL DOCUMENT FROM THE COURT THAT
AFFECTS YOUR RIGHTS. READ THIS SUMMONS CAREFULLY. IF YOU DO
NOT UNDERSTAND IT, CONTACT AN ATTORNEY FOR LEGAL ADVICE.**

1. A lawsuit has been filed against you. A copy of the lawsuit and other court papers were
   served on you with this Summons.

2. If you do not want a judgment taken against you without your input, you must file an
   Answer in writing with the Court, and you must pay the required filing fee. To file your
   Answer, take or send the papers to Clerk of the Superior Court, 201 W. Jefferson,
   Phoenix, Arizona 85003 or electronically file your Answer through one of Arizona's
   approved electronic filing systems at http://www.azcourts.gov/efilinginformation.
   Mail a copy of the Answer to the other party, the Plaintiff, at the address listed on the top
   of this Summons.
   Note: If you do not file electronically you will not have electronic access to the documents
   in this case.

3. If this Summons and the other court papers were served on you within the State of
   Arizona, your Answer must be filed within TWENTY (20) CALENDAR DAYS from the
   date of service, not counting the day of service. If this Summons and the other court papers
   were served on you outside the State of Arizona, your Answer must be filed within
   THIRTY (30) CALENDAR DAYS from the date of service, not counting the day of
   service.

Requests for reasonable accommodation for persons with disabilities must be made to the court by parties at least 3 working days in advance of a scheduled court proceeding.

GIVEN under my hand and the Seal of the Superior Court of the State of Arizona in and for the County of  MARICOPA

SIGNED AND SEALED this Date: *November 09, 2020*

*JEFF FINE*
Clerk of Superior Court

By: *GABRIELA ROA*
Deputy Clerk



Requests for an interpreter for persons with limited English proficiency must be made to the division assigned to the case by the party needing the interpreter and/or translator or his/her counsel at least ten (10) judicial days in advance of a scheduled court proceeding.

If you would like legal advice from a lawyer, contact Lawyer Referral Service at 602-257-4434 or https://maricopabar.org. Sponsored by the Maricopa County Bar Association.

Clerk of the Superior Court
*** Electronically Filed ***
G. Roa, Deputy
11/9/2020 4:24:29 PM
Filing ID 12201319

Person/Attorney Filing: Michael C McKay
Mailing Address: 5635 N. Scottsdale Road Suite 170
City, State, Zip Code: Scottsdale, AZ 85250
Phone Number: (480)681-7000
E-Mail Address: mmckay@mckaylaw.us
[ □ ] Representing Self, Without an Attorney
(If Attorney) State Bar Number: 023354, Issuing State: AZ

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## IN AND FOR THE COUNTY OF MARICOPA

Eduino Pinheiro
Plaintiff(s),
v.
Monsanto Company
Defendant(s).

Case No. CV2020-055746

**CERTIFICATE OF
COMPULSORY ARBITRATION**

I certify that I am aware of the dollar limits and any other limitations set forth by the
Local Rules of Practice for the Maricopa County Superior Court, and I further certify that
this case IS NOT subject to compulsory arbitration, as provided by Rules 72 through 77 of
the Arizona Rules of Civil Procedure.

RESPECTFULLY SUBMITTED this

By: Michael C McKay /s/
    Plaintiff/Attorney for Plaintiff

AZturboCourt.gov Form Set #513.44450



Select Language

Powered by Google **Translate**

# Civil Court Case Information – Case History

## Case Information

| | | | |
|---|---|---|---|
| Case Number: | CV2020-055746 | Judge: | Agne, Sara |
| File Date: | 11/9/2020 | Location: | Northeast |
| Case Type: | Civil | | |

## Party Information

| Party Name | Relationship | Sex | Attorney |
|---|---|---|---|
| Eduino N Pinheiro | Plaintiff | Male | Michael McKay |
| Monsanto Company | Defendant | | Pro Per |

## Case Documents

| Filing Date | Description | Docket Date | Filing Party |
|---|---|---|---|
| 12/1/2020 | AFS - Affidavit Of Service | 12/7/2020 | |
| **NOTE:** MONSANTO COMPANY | | | |
| 11/9/2020 | COM - Complaint | 11/10/2020 | |
| **NOTE:** Complaint | | | |
| 11/9/2020 | CSH - Coversheet | 11/10/2020 | |
| **NOTE:** Civil Cover Sheet | | | |
| 11/9/2020 | CCN - Cert Arbitration - Not Subject | 11/10/2020 | |
| **NOTE:** Certificate Of Compulsory Arbitration - Is Not Subject To | | | |
| 11/9/2020 | SUM - Summons | 11/10/2020 | |
| **NOTE:** Summons | | | |

## Case Calendar

**There are no calendar events on file**

## Judgments

**There are no judgments on file**

# DECLARATION OF SERVICE

| **Case:**<br>CV2020-055746 | **Court:**<br>SUPERIOR COURT OF ARIZONA<br>IN MARICOPA COUNTY | **County:**<br>MARICOPA | **Job:**<br>5081636 |
|---|---|---|---|
| **Plaintiff / Petitioner:**<br>EDUINO PINHEIRO | | **Defendant / Respondent:**<br>MONSANTO COMPANY | |
| **Received by:**<br>Urban Spy, LLC | | **For:**<br>MCKAY LAW | |
| **To be served upon:**<br>MONSANTO COMPANY STAT AGENT Corporation Service Company | | | |

I, Jason Brown, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

| **Recipient Name / Address:** | MONSANTO COMPANY STAT AGENT Corporation Service Company, Corporate: 8825 N. 23rd Avenue, Suite 100, PHOENIX, AZ |
|---|---|
| **Manner of Service:** | Authorized, Nov 18, 2020, 2:36 pm MST |
| **Documents:** | SUMMON, COMPLAINT, CERTIFICATE OF COMPULSORY ARBITRATION |

**Additional Comments:**

1) Successful Attempt: Nov 18, 2020, 2:36 pm MST at STATE AGENT: 8825 N. 23rd Avenue, Suite 100, PHOENIX, AZ received by MONSANTO COMPANY STAT AGENT Corporation Service Company. BROOKLYN VANDEVENTER.

5'3" pink hair blue eyes caucasian 25yrs old female.

I declare under penalty of perjury that the foregoing is true and correct

| | |
|---|---|
| _(signature)_ | 11/18/2020 |
| Jason Brown | **Date** |

Urban Spy, LLC
6249 E Beck Ln
Scottsdale, AZ 85254
4808861839

**Fees:** $50.00

FILED BY A. SUTTON, DEF

CLERK OF THE SUPERIOR COURT
RECEIVED HE
DOCUMENT DEPOSITORY

2020 DEC -1  AM 11:02